**UNITED STATES of America, Plaintiff,**

v.

**Merl McROY, Jr., Defendant.**

**No. 78–00112–01–CR–W–1.**

United States District Court,
W. D. Missouri, W. D.

July 10, 1978.

Ronald S. Reed, U. S. Atty., Kansas City, Mo., Grover G. Hankins, Sp. Atty., Dept. of Justice, Kansas City, Mo., for plaintiff.

Basil L. North, Jr., North, Colbert & Fields, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR REDUCTION OF SENTENCE

### I.

JOHN W. OLIVER, Chief Judge.

This case pends on defendant's Rule 35 motion to reduce the sentence of one year and $2,500 imposed by this Court on June 16, 1978. The execution of that sentence was stayed until June 26, 1978, and the Court entered an order that the defendant surrender himself to the Attorney General by reporting to the Medical Center for Federal Prisoners at Springfield, Missouri.

Defendant's motion prays in the alternative for probation or a split sentence with designation of the Kansas City, Missouri, Community Treatment Center as the designated institution. If the split sentence is imposed defendant's motion prays that defendant be permitted to participate in the work release program of that institution. Defendant's motion alleges that this Court's original sentence was "based on misunderstanding of material facts" and that the record "fails to support material factors on which the severity of defendant's sentence rested."

In support of that motion, defendant directs our attention to a prosecution in the District of Kansas entitled *United States v. Terry LeRoy Schmidt, William Edward Thomas, Jr., and Ronald Eugene Whelan,* No. 77–20110, filed on August 27, 1977. In that case the three named defendants were sentenced on their respective pleas of guilty by the Honorable Earl E. O'Connor, United States District Judge for the District of Kansas.

Defendant has accurately quoted portions of this Court's statements made during the course of sentencing on June 16, 1978 in which this Court stated that it was "satisfied that the principal participants in the conspiracy to defraud an agency of the United States are this defendant and Terry Schmidt," that "the principle of avoidance of disparity would be satisfied with a one year sentence in light of the fact that Judge O'Connor had reduced Mr. Schmidt's initial two year sentence to a year and a day," and that "Judge O'Connor apparently felt, and I would agree with him completely, that the culpability of Thomas and Whelan would stand in an entirely different situation than the two principal people that put this thing together, which could not have worked unless this defendant, discharging duties he owed the agency by which he was employed, and violated the public trust, did what he did."

Defendant states in support of his motion that "the presentence report and other information available to the Court at the time of sentencing were insufficient to adequately inform the Court of sufficient facts to enable it to sentence the defendant fairly."

The government filed a response to defendant's pending motion in which it stated that "the government does not concur in or oppose the defendant's motion for reduction in sentence but leaves the matter entirely in the Court's discretion." The government's response then stated that:

Since the sentences of individuals convicted of similar offenses arising from this investigation has been placed in issue, the following information is provided.

Ronald Whelan and William Thomas were both employed as Relocation Specialists for the Central Relocation Agent of Kansas City, Missouri, as was Merl McRoy. The Central Relocation Agency performed business and household relocations necessitated by local urban renewal programs which were funded, in part, by the Department of Housing and Urban Development. Both Whelan and Thomas became involved in a scheme with Terry Schmidt which involved rigged bidding and both received bribes from Schmidt. Both Whelan and Thomas plead guilty to conspiracy to defraud the United States in violation of 18 U.S.C. § 371 in the District of Kansas. Both were sentenced on December 19, 1977 (case number 77–20112–01) to three years imprisonment on the condition that they serve six months in a jail type institution and execution of the remaining sentence was suspended and they were placed on probation for a two and one half year period. Thomas was fined $2,000 and Whelan was ordered to make restitution to the United States of $6,000.00.

Otto Nigro, Jr., an associate of Terry Schmidt, originated, according to Terry Schmidt, the scheme to insure the outcome of the "competitive" bid process required by the Department of Housing and Urban Development. Nigro plead guilty to causing a false statement to be presented to the Department of Housing and Urban Development in violation of 18 U.S.C. § 1001 in the District of Kansas. Nigro was sentenced (case number 77–20157–01) to two years imprisonment on the condition that he serve three months in a jail or treatment type facility and execution of the remaining sentence was suspended and he was placed on probation for a period of 21 months.

For the reasons stated below, defendant's Rule 35 motion will be granted and the original sentence imposed will be reduced to the same sentence imposed by Judge O'Connor on William Edward Thomas, Jr., and Ronald Eugene Whelan in the case which pended in the District of Kansas.

## II.

This case illustrates the difficulties which almost inevitably arise when the government elects to prosecute what is basically a single prosecution in two different judicial districts, particularly in cases such as this where no valid reason for such a splitting has either been stated or is apparent.

Although the presentence report furnished this Court with information that a companion case had been disposed of in the District of Kansas, and what sentences were imposed by Judge O'Connor in that case, the official version furnished the Probation Office of this district by the Special Attorney for the government, in sharp contrast to the procedures followed in the District of Kansas did not give the Probation Office of this district or this Court the benefit of any details concerning the Kansas case.[1]

---

1. In apparent recognition of the duties codified in Section 5.3 of the *ABA Standards Relation to Sentencing Alternatives and Procedures*, and in Sections 6.1 and 6.2 of the *ABA Standards Relating to the Prosecution Function*, the government submitted detailed information to the Probation Office in the District of Kansas and Judge O'Connor concerning the manner in which the relocation of businesses and families under programs administered by the Land Clearance for Redevelopment Authority was administered by that agency and by the Central

The official version furnished the Probation Office of this district for inclusion in the presentence report to be submitted to this Court stated in its entirety the following:

> Official Version. According to information provided by a Special Attorney for the U. S. Department of Justice, the facts surrounding the instant offense appear to be as follows:

> The defendant, while employed as a relocation specialist for the Central Relocation Agency, a subsidiary of the Department of Housing and Urban Development (HUD) agreed with Terry Schmidt that Schmidt would procure collusive bidders who would submit bids to the Central Relocation Agency for the relocation of the Pink Pussycat Lounge of Kansas City, Missouri. This relocation was to be reimbursed by funds supplied to the Central Relocation Agency of Kansas City, Missouri, pursuant to a funding agreement with HUD of Kansas City, Kansas.

> Schmidt, a moving company operator, advised that he was approached by Merl McRoy and asked for $500 to pay for an [outstanding medical bill]. Schmidt then gave the money to McRoy because he figured McRoy might be of assistance to him at a later date in his position as a relocation specialist. Subsequently, Schmidt was contacted by McRoy who asked Schmidt to meet him at a given location to discuss the furnishing of a bid for the relocation of the Pink Pussycat and Barrel Buffet Lounges. Schmidt attended a meeting with McRoy and during the course of their conversation was informed by McRoy that the city was having trouble getting the Barrel Buffet and

Relocation Agency, which was created by the City of Kansas City, Missouri. That information revealed that both Thomas and Whelan were employed as Relocation Specialists by the Land Clearance for Redevelopment Authority and that the government had under investigation and prosecution many relocations over a long period of time. The relocation and the bribes taken by the relocation specialist defendants included Smitty's Van and Storage Company, the firm co-managed by defendant Schmidt, and the relocation of Senda Card Corporation. The relocation of the Pink Pussycat and the Barrel Buffet were also mentioned and the government advised the District of Kansas that in regard to those relocations "the same scheme was followed, i. e., Schmidt would obtain false and grossly inflated bids from Haggard Heavy Hauling and R. L. Jones, which assured him of the bid at a greatly inflated profit."

The Probation Office of the District of Kansas and Judge O'Connor were also advised as follows:

> Thomas pled guilty as charged and has no understanding or agreement with the Government.

> Whelan pled guilty as charged with the understanding that the Government would not recommend or oppose any sentence, whether it be confinement for a period of time or probation.

> Terry Schmidt pled guilty to a single count of the indictment and entered an agreement with the United States which obligated Schmidt to fully and honestly cooperate with the Government in this investigation of the defraudment of HUD; and to make restitution of $110,000 by certified check on or before December 5, 1977, and obligated the United States to dismiss the remaining counts of the indictment and to inform the Court to the degree of cooperation accorded the Government by Schmidt.

Additional information submitted by the Special Attorney to Judge O'Connor concerned the relocation of the Mo-Kan Wrecking Company, owned by Otto Nigro, Jr. The court was advised that the relocation of that company, which occurred prior to the relocation of Smitty's Van and Storage Company, the subject of the first District of Kansas prosecution, had been under the supervision of relocation specialist Whelan and that while the government had "no direct evidence that Whelan was involved criminally to defraud HUD in this move," it was the government's position that Whelan "was, at least, negligent in not determining that the bids were false and inflated and in not discovering that it was a self-move."

The data collected from the District of Kansas also shows that after the completion of the prosecution of Schmidt, Thomas, and Whelan, the government on December 9, 1977, obtained an indictment of Nigro, who also entered a plea of guilty in the District of Kansas. Judge O'Connor imposed the same sentence on Nigro as he had earlier imposed on Thomas and Whelan. For reasons which could be said to be apparent, but which have not been either implicitly or expressly stated, the government then elected to complete its prosecution of persons involved in the overall relocation scheme to defraud the United States in this district rather than in the District of Kansas.

Pink Pussycat relocations accomplished and that defendant wanted Schmidt to perform them. McRoy then instructed Schmidt to get three bids "any way he could." Shortly after the aforementioned meeting with McRoy, Schmidt recruited two local movers, John Haggard and R. L. Jones, to bid on the relocations of the two establishments. Haggard and Jones submitted bids using fictitious figures provided by Schmidt, thus enabling Schmidt to become a successful bidder.

It is alleged that McRoy knew, or had reason to know, that the bids procured by Schmidt were false. Nevertheless, abdicating his professional and governmental responsibility, he nurtured the collusive scheme by giving his constant approval and causing the relocation accounts to be forwarded through the Central Relocation Agency to HUD, thereby committing an overt act in the conspiracy to defraud HUD.

Schmidt advised that upon completing the relocation of the Pink Pussycat, he gave approximately $2,000 to $2,500 to the defendant for "setting up" the jobs for him. Schmidt further stated that during May, 1974, the defendant contacted Schmidt and asked him to move his brother who had just finished law school in Lawrence, Kansas, from Lawrence to Kansas City, Kansas. Schmidt thereupon sent one of his trucks to Lawrence and performed this move for McRoy without charge.

Pursuant to an agreement with the government defendant is prepared to tender a plea of guilty to a One-Count Information charging him with conspiracy to defraud the Department of Housing and Urban Development in violation of Title 18, United States Code, Section 371. At the request of the defendant's attorney, and with the defendant's consent, an early presentence investigation was prepared.

After study of defendant's pending motion and the government's response, we requested the Probation Office of this District to obtain copies of the indictments, pleas of guilty, presentence reports, and other data

presented to Judge O'Connor in the two closely related Kansas prosecutions described above and in footnote 1. Any doubt about the material facts concerning the relocation of the Pink Pussycat or the Mo-Kan Wrecking Company, owned by Otto Nigro, Jr., is dispelled by the letters written by the Probation Office in the District of Kansas and written directly to Judge O'Connor, discussed in footnote 1.

The data collected by the Probation Office in this District subsequent to the filing of defendant's Rule 35 motion establishes that both District of Kansas prosecutions, involving four individual defendants, were completed before the prosecution of the single defendant in this District was commenced. That data also shows that although the prosecution against Schmidt, Thomas and Whelan was commenced before the prosecution of Otto Nigro, Jr., which was not filed until December 9, 1977, it is clear from a letter written to the Probation Office in Kansas on February 15, 1978, that the Special Attorney in charge of the overall investigation was satisfied that Nigro, at the time of the relocation of the Mo-Kan Wrecking Company in December of 1972, had "originated the scheme subsequently employed to defraud HUD by Terry Schmidt in the subsequent relocation of Smitty's Van and Storage (May-June, 1973), Senda Card Corporation (January-February, 1974), the Pink Pussycat in March of 1974, and the Barrel Buffet in March, 1974." The Probation Office of the District of Kansas was also advised by the Special Attorney that "Terry Schmidt digested what Nigro taught him concerning the defrauding of HUD on the relocation of businesses and implemented the same procedure in his relocation and the other aforementioned relocations."

Without revealing the contents of the presentence reports submitted to the Probation Office for Judge O'Connor's review, it is sufficient to say that Judge O'Connor had before him substantial data which was inconsistent with the government's view that defendant Nigro was the master-mind behind the overall scheme to defraud HUD.

The presentence reports established that Judge O'Connor had more than adequate data before him to conclude, contrary to the view expressed by the government to the Probation Office in the District of Kansas, that defendant Nigro's participation in the overall scheme was quite comparable to that of defendants Thomas and Whelan and that Nigro was not the master-mind which the government believed him to be. Indeed, this Court can state with confidence, after having had the benefit of the presentence data submitted to Judge O'Connor, that if it had had the duty to impose sentence in the District of Kansas cases it would have quite likely, subject to what may have been said on allocution, imposed precisely the same sentences which Judge 'O'Connor imposed under the circumstances. We are also reasonably confident that had the prosecution of this case been commenced in District of Kansas and if Judge O'Connor, rather than this Court, had accepted defendant's plea of guilty, that Judge O'Connor would have imposed precisely the same sentence on the defendant in this case as he imposed in connection with Thomas and Whelan in the first District of Kansas prosecution.

It is also clear that Judge O'Connor must have given appropriate attention to the fact that both those defendants violated the public trust. The presentence report in connection with defendant Thomas concluded with the statement that "the Court must consider that this defendant was in a position of public trust when the offense occurred." Defendant Whelan's presentence included a similar statement. Neither of those defendants, like the defendant in the case at bar, had prior criminal records. Both were obviously eligible for probation, except for the fact that the imposition of a sentence which failed to include some confinement would unduly depreciate the seriousness of the offense, particularly when viewed in light of the positions of public trust occupied by all three defendants. *See,* Section 2.5(c)(iii), of the *ABA Standards Relating to Sentencing Alternatives and Procedures.*

The probability that the defendant in the present case would have been given the same sentence as the two relocation specialists involved in the District of Kansas case is increased by the fact that the defendant in this case accepted a bribe, of $2,500, the smallest bribe taken by the three relocation specialist defendants. Nigro's "take" was in the same range as the relocation specialists. The fact that defendant Schmidt made restitution of $110,000 by certified check in order to seal his plea bargain is in sharp contrast to all other defendants who have been prosecuted and convicted, all of which requires a finding that defendant McRoy stands in a similar position to defendants Whelan and Thomas rather than defendant Schmidt.

### III.

██ Defendant's Rule 35 motion alleges that the Court may have relied on incomplete and inaccurate information at the time sentence was imposed. There is no question that if such was the case the Court may properly grant relief by reducing defendant's sentence under the circumstances. *United States v. Sturgeon,* 529 F.2d 993 (8th Cir. 1976).

A recent case in the Second Circuit is similar to the case at bar. *See, United States v. Stein,* 544 F.2d 96 (2nd Cir. 1976) and its aftermath in *United States v. Rubinson,* 426 F.Supp. 266 (S.D.N.Y.1976). The Second Circuit Court of Appeals concluded in *Stein* that the trial court had relied on inaccurate information at the time of sentencing and therefore remanded the case for resentencing by a different judge.

In *Rubinson,* a co-defendant of Stein filed a Rule 35 motion for reduction of sentence. The sentencing judge's attention was directed to the fact that the judge who resentenced Stein had imposed a sentence which permitted Stein to be released on probation after serving 19 months in prison rather than the ten year sentence initially imposed by the sentencing judge. The sentencing judge therefore granted co-defendant Rubinson's Rule 35 motion to reduce sentence because "the disparity in sentence now oc-

casioned by Sidney Stein's reduction of sentence . . . makes the sentence of incarceration previously imposed on Mr. Rubinson disproportionately excessive and unjust." For another similar recognition of injustice produced by disparate sentences *see, United States v. Wiley,* 267 F.2d 453 (7th Cir. 1959), and the later opinion in the same case reported at 278 F.2d 500 (7th Cir. 1960).

 In light of the factual data now before this Court, it is clear that the allegations of defendant's motion are sustained by information collected by the Probation Office subsequent to the imposition of our original sentence. The supplemental presentence data establishes that defendant McRoy, although he occupied a position of public trust, must nevertheless be viewed as a minor participant in the overall scheme that was the subject of the investigation and prosecution in the District of Kansas. We find and conclude that justice and the principle of avoidance of disparity between co-defendants who stand in the same relative situation require that defendant McRoy's Rule 35 motion should be granted and that his sentence be reduced to a sentence comparable to the sentences imposed by Judge O'Connor on the two other relocation specialists involved in the overall scheme to defraud the United States.

For the reasons stated, it is

ORDERED (1) that defendant's Rule 35 motion should be and the same is hereby granted. Defendant is entitled to the alternative relief prayed for in that motion. Defendant's original sentence should be and is hereby reduced to a sentence comparable in all respects to those imposed in the District of Kansas on the relocation specialists there involved. It is further

ORDERED (2) that the original Judgment and Commitment entered by this Court on June 16, 1978, should be and the same is hereby declared void and set aside. The Clerk is directed to prepare a new Judgment and Commitment which will reflect the reduction of sentence above stated and shall contain a reduced sentence in precisely the same language as the Judg-

ment and Commitments executed by Judge O'Connor in regard to defendants Thomas and Whelan in the case which pended before him in the District of Kansas. The new Judgment and Commitment shall include the same fine initially imposed and shall provide that the execution of the reduced sentence be stayed until July 17, 1978, at 9:00 o'clock a. m., in order that proper arrangements may be made with the Kansas City, Missouri Community Treatment Center.